# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 1, 2011        Decided March 13, 2012

No. 11-1107

VERITAS HEALTH SERVICES, INC., DOING BUSINESS AS CHINO
VALLEY MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF
HEALTH CARE PROFESSIONALS, NUHHCE, AFSCME,
AFL-CIO,
INTERVENOR

———

Consolidated with 11-1127

———

On Petition for Review
and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———

*Theodore R. Scott* argued the cause for petitioner. With
him on the briefs was *Edward F. Berbarie*. *Steven L. Rahhal*
entered an appearance.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney. *Ruth E. Burdick*, Attorney, entered an appearance.

*Lisa C. Demidovich* argued the cause for intervenor United Nurses Associations of California/Union of Health Care Professionals, NUHHCE, AFSCME, AFL-CIO, in support of respondent.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: In an April 2010 union election, registered nurses working for Veritas Health Services voted to make the United Nurses Associations of California/Union of Health Care Professionals their bargaining representative. But Veritas would not bargain with the Union because Veritas claimed that pro-Union conduct by supervising charge nurses had coerced the registered nurses' votes and tainted the election. Rejecting Veritas's claims, the National Labor Relations Board certified the Union and found that Veritas had committed an unfair labor practice by refusing to bargain. Veritas has petitioned for review in this Court. We conclude that precedent and substantial evidence support the Board's conclusions. We therefore deny Veritas's petition and grant the Board's cross-application for enforcement of its order.

3

I

By early 2010, the United Nurses Associations of California/Union of Health Care Professionals organized a campaign to represent the nurses at the Chino Valley Medical Center, a community hospital operated by Veritas Health Services. In order for the Union to successfully petition the National Labor Relations Board to hold an election, the Union needed cards authorizing representation from 30% of employees. *See* 29 C.F.R. § 101.18(a).

In seeking the necessary authorization cards, the Union reached out to registered nurses. It also contacted charge nurses. Charge nurses supervise registered nurses by, among other things, directing and assigning work to registered nurses.

The Union's efforts to recruit charge nurses succeeded. Several charge nurses signed authorization cards, met with Union representatives, and attended Union meetings. Some also expressed pro-Union sympathies.

Some of the charge nurses actively encouraged subordinate registered nurses to support the Union. The two charge nurses who most actively promoted the Union were Angelica Silva and Cheryl Gilliatt. Silva talked to six registered nurses about future Union meetings, forwarding text-message reminders to some and approaching others in person to ask if they planned to attend. Gilliatt did even more. She told about 10 registered nurses to attend the Union's meetings, saying, for example, "You need to attend after work today." Hr'g Tr. 310, May 26, 2010. And she encouraged them to sign authorization cards, asking, for example, "Have you signed a card? When are you planning on going? You only have until Sunday, and you need to go and sign the card." *Id.* at 328.

On February 22, 2010, after collecting the necessary authorization cards, the Union petitioned the National Labor Relations Board to hold an election. The election was scheduled for April 1 and 2, 2010.

On March 5, the parties stipulated that these charge nurses were supervisors under the National Labor Relations Act. As a result, the charge nurses could not vote in the election. After the stipulation, charge nurses apparently stopped most of their pro-Union conduct. Soon thereafter, moreover, Veritas promoted Gilliatt and Silva to managerial positions. Perhaps not coincidentally, both Gilliatt and Silva then actively opposed the Union. Gilliatt told 20 to 30 registered nurses that she no longer supported the Union. Silva told four registered nurses the same thing. And during election week, both signed letters – personalized for every registered nurse and printed on company letterhead – that urged the registered nurses to vote against the Union:

> Thursday, April 1 and Friday, April 2, 2010 are very important dates for you, your family and the hospital. It's very important that you vote and please remember your vote is secret.
>
> We've already seen the union's misrepresentation, bullying tactics and the divisiveness that has resulted. In contrast, we have been open and honest with you and provided only factual information to help you make an informed decision.
>
> We the Chino Family enjoy our relationship and hope to maintain a union free environment. Please vote no on Thursday, April 1 and Friday, April 2, 2010.

Letter from Chino Valley Medical Center, Joint Appendix 653. The letters were distributed to most of the registered nurses.

The Union won the election, with 72 votes in favor of the Union and 39 votes against (plus four contested ballots).

Veritas filed objections with the Board, claiming that the charge nurses' pro-Union conduct had tainted the election by coercing and interfering with the free choice of the registered nurses they supervised. After a multi-day hearing, the Administrative Law Judge ruled against Veritas. The Board adopted the ALJ's opinion and certified the Union. The next day, the Union sent Veritas a letter asking Veritas to bargain collectively. Veritas refused, saying the certification was illegitimate because the election was invalid. The day after that, the Union filed an unfair labor practice charge for refusing to bargain. Because the Board had already upheld the election, it rejected Veritas's claims and found that Veritas committed an unfair labor practice by refusing to bargain with the Union. Veritas has petitioned this Court for review, and the Board has cross-applied for enforcement of its order.

## II

An employer must bargain collectively with a union that is duly certified as the employees' bargaining representative. If the employer refuses to do so, it commits an unfair labor practice under Section 8(a)(5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(5). "An employer who violates section 8(a)(5) also derivatively violates section 8(a)(1), which makes it unlawful for an employer 'to interfere with, restrain, or coerce employees in the exercise of' their statutory labor rights." *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 309 n.5 (D.C. Cir. 2003) (quoting 29 U.S.C. § 158(a)(1)).

Here, Veritas admits that it refused to bargain collectively with the Union. But it defends its refusal to bargain on the ground that the Union should not have been certified. Specifically, Veritas argues that the charge nurses' pro-Union conduct made the union election invalid.

A

Our review of this kind of NLRB decision is narrow. "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Wayneview Care Center v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011) (citation omitted). In the specific context of a representation election, we "will set aside a representation election only if the petitioning party demonstrates that the conduct complained of interfered with the employees' exercise of free choice to such an extent that it materially affected the election." *U-Haul Co. of Nevada v. NLRB*, 490 F.3d 957, 961 (D.C. Cir. 2007) (citation, internal quotation marks, and brackets omitted).

Under that standard, the question here is whether the pro-Union conduct of the charge nurses rose to the level of interference with the registered nurses' exercise of free choice.

In analyzing that question, we begin by noting that this case presents the unusual situation of a supervisor alleged to have engaged in improper interference in *support* of a union. The National Labor Relations Act excludes supervisors from its definition of "employee." *See* 29 U.S.C. § 152(3). An employer thus has "the right to discharge such supervisors because of their involvement in union activities or union membership." *Florida Power & Light Co. v. Int'l*

*Brotherhood of Electrical Workers, Local 641*, 417 U.S. 790, 808 (1974). Given that reality, supervisors do not usually engage in pro-union activities against the wishes of management. But the issue of pro-union conduct by a supervisor sometimes arises when it was unclear or disputed at the time of the pro-union activity whether the employee was a statutory supervisor. *See, e.g.*, *Northeast Iowa Telephone Co.*, 346 N.L.R.B. 465, 466 (2006); *Terry Machine Co.*, 332 N.L.R.B. 855, 855-56 (2000).

When faced with pro-union conduct by supervisors, the Board uses a two-pronged test – known as the *Harborside* test – to decide whether the conduct requires setting aside the election:

> (1) Whether the supervisor's prounion conduct reasonably tended to coerce or interfere with the employees' exercise of free choice in the election.

> This inquiry includes: (a) consideration of the nature and degree of supervisory authority possessed by those who engage in the prounion conduct; and (b) an examination of the nature, extent, and context of the conduct in question.

> (2) Whether the conduct interfered with freedom of choice to the extent that it materially affected the outcome of the election, based on factors such as (a) the margin of victory in the election; (b) whether the conduct at issue was widespread or isolated; (c) the timing of the conduct; (d) the extent to which the conduct became known; and (e) the lingering effect of the conduct.

*Harborside Healthcare, Inc.*, 343 N.L.R.B. 906, 909 (2004).

Pro-union speech by a supervisor, standing alone, falls short of coercion or interference under *Harborside*'s first prong. In *Northeast Iowa Telephone Company*, for example, the Board found no coercion or interference even though managers attended union meetings, participated in those meetings, told employees that the union could help prevent layoffs, and signed authorization cards in front of employees. *See* 346 N.L.R.B. at 466-67.

On the other side of the line, supervisory solicitation of authorization cards is considered coercive. *See Chinese Daily News*, 344 N.L.R.B. 1071, 1072 (2005). The solicitation of an authorization card by a supervisor "has an inherent tendency to interfere with the employee's freedom to choose to sign a card or not." *Harborside Healthcare, Inc.*, 343 N.L.R.B. at 911. The employee "will reasonably be concerned that the 'right' response will be viewed with favor, and a 'wrong' response with disfavor." *Id.* The Board has found solicitation not only in cases of direct solicitation but also in cases where "employees had reason to believe that whether they signed a card would become known" to their pro-union supervisor. *Madison Square Garden CT, LLC*, 350 N.L.R.B. 117, 122 (2007).

Importantly, even if a supervisor's initial pro-union conduct would be considered coercion or interference, the Board will uphold the election if "mitigating circumstances sufficiently negated the inherently coercive effect" of the conduct – or, put another way, if in light of the mitigating circumstances, the conduct did not materially affect the outcome of the election. *SNE Enterprises, Inc.*, 348 N.L.R.B. 1041, 1042 (2006); *see also Madison Square Garden CT, LLC*, 350 N.L.R.B. at 122; *Harborside Healthcare, Inc.*, 343 N.L.R.B. at 910 n.12, 914.

B

Veritas complains here that several charge nurses spoke in favor of the Union, attended Union meetings, and signed authorization cards in front of registered nurses. According to Veritas, those activities amount to supervisory solicitation of authorization cards – conduct constituting impermissible coercion. But in *Northeast Iowa Telephone Company*, the Board found almost identical conduct not coercive. *See* 346 N.L.R.B. at 466-67. Veritas also complains that the charge nurses were in close contact with the Union, regularly meeting with Union officials and referring questions about unionization to the Union's organizing director. Those facts, however, do not defeat the Board's finding that the charge nurses' conduct fell short of coercion under the *Harborside* test. *Harborside* permits a supervisor to support a union. A supervisor's conduct presents a problem when it reasonably tends to coerce or interfere with the employees' free choice in the election. Many charge nurses here clearly supported the Union. But without any indication in the record that the support tended to coerce or interfere with the registered nurses' free choice, we will not disturb the Board's reasonable conclusion with respect to those charge nurses.

The conduct of charge nurses Gilliatt and Silva presents a closer question. Silva approached or sent text messages to six registered nurses to notify them about Union meetings. Gilliatt instructed about 10 registered nurses to attend the meetings. And she actually told some registered nurses to sign authorization cards.

But even assuming that the initial conduct of Gilliatt and Silva tended to coerce or interfere with the registered nurses' free choice, their conduct was mitigated by their subsequent actions. After Gilliatt and Silva were promoted, they actively

campaigned *against* the Union in the run-up to the election. Gilliatt told 20 to 30 registered nurses that she no longer supported the Union; Silva told four. And Gilliatt and Silva both signed personalized company letters that urged registered nurses to vote against the Union. The letters reached most registered nurses.

By the time of the election, therefore, registered nurses would have had no reason to feel pro-Union coercion or interference from Gilliatt's or Silva's earlier conduct. Indeed, any registered nurses who felt pressured by Gilliatt or Silva would have felt coerced to vote *against* the Union.

In short, Veritas has not shown that we should overturn the Board's decision upholding the election. *See SNE Enterprises, Inc.*, 348 N.L.R.B. at 1042-44; *Northeast Iowa Telephone Co.*, 346 N.L.R.B. at 466-67; *Harborside Healthcare, Inc.*, 343 N.L.R.B. at 909-13.

## III

Veritas also challenges some of the evidentiary rulings that were made by the ALJ at the hearing and that were approved by the Board. We review the ALJ's rulings for abuse of discretion. *See Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 834 (D.C. Cir. 1998).[1]

---

[1] As a technical matter, it might be argued that the Board reviews the ALJ's ruling for abuse of discretion, *see Aladdin Gaming, LLC*, 345 N.L.R.B. 585, 587 (2005), and we review the Board's decision under the arbitrary and capricious standard. But little if anything turns on the wording. The key point is this: When an ALJ's evidentiary ruling has been upheld by the Board, our review is deferential.

Veritas complains about two of the ALJ's evidentiary rulings.

First, the ALJ redacted some documents and limited certain testimony so as to prevent disclosure of the names of registered nurses who had been in contact with the Union. Veritas claims it would have used the names and the communications to more fully develop the record and to test witness credibility. The Board concluded that the ALJ's evidentiary rulings were not an abuse of discretion.

"It is well settled that Section 7 of the Act gives employees the right to keep confidential their union activities, including their attendance at union meetings." *Guess?, Inc.*, 339 N.L.R.B. 432, 434 (2003) (citing 29 U.S.C. § 157). For an employer to obtain information about confidential union activities, "the employer's interest in obtaining this information must outweigh the employees' confidentiality interests under Section 7 of the Act." *Id.* In *National Telephone Directory Corporation*, for example, the Board ruled that an employer could not seek the names of employees who signed authorization cards or attended union meetings because of "the potential chilling effect on union activity that could result from employer knowledge of the information." 319 N.L.R.B. 420, 421 (1995). That potential chilling effect outweighed the employer's "right to test the credibility of the General Counsel's witnesses" during cross-examination. *Id.*

Here, the ALJ protected names of nurses who attended Union meetings or expressed views about the Union during the Union's organizing campaign. In light of the settled principles protecting the confidentiality of employees' union activities, the Board reasonably determined that the ALJ did not abuse her discretion in protecting the names of the registered nurses.

Second, the ALJ excluded testimony about communications between the Union and the charge nurses. *See* 29 C.F.R. § 102.35(a)(4); *Hovey Electric, Inc.*, 328 N.L.R.B. 273, 273 n.1 (1999). The ALJ "declined to receive evidence of interactions solely between union representatives and supervisory charge/relief charge nurses" because "such interactions, unknown to eligible voters, could not reasonably tend to interfere with employees' free and uncoerced election choice in any material way." *Veritas Health Services, Inc.*, No. 31-RC-8795, slip op. at 5 n.7 (N.L.R.B. July 7, 2010). The ALJ's explanation is reasonable, and the Board therefore reasonably determined that the ALJ did not abuse her discretion in excluding this testimony.

IV

Veritas raises one final argument: that the unfair labor practice charge against it was untimely. A union ordinarily must file an unfair labor practice charge within six months of the alleged unfair labor practice. *See* 29 U.S.C. § 160(b). Veritas claims that it refused to bargain with the Union on April 14, 2010, but that the Union did not file a charge until February 3, 2011. Veritas ignores, however, that a new refusal to bargain constitutes a new violation of the Act. *See Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1264 n.2 (D.C. Cir. 1991). As the Board explained below, the Union sent Veritas a letter on January 26, 2011, asking Veritas to bargain collectively with the Union. On February 2, 2011, Veritas refused to do so. The charge was filed the next day. Therefore, the unfair labor practice charge was timely. *See Veritas Health Services, Inc.*, 356 N.L.R.B. No. 137, slip op. at 1 n.1, 2 (Apr. 12, 2011).

13

\* \* \*

We deny Veritas's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*